IN THE MATTER OF L. R. BRETZ, AN ATTORNEY AND COUNSELOR AT LAW, RESPONDENT.

No. 12896.
Decided July 14, 1975.
542 P.2d 1227.

24

## ORDER OF DISBARMENT

The attached Report, Findings of Fact, and Recommendations of the Commission on Practice of the Supreme Court is hereby adopted as the Findings and Conclusions of this Court. The report was filed with this Court on May 28, 1975. On that day, a citation was issued and served on L. R. Bretz.

Thereafter, on June 3, 1975, L. R. Bretz filed a Motion for Continuance of the matter with reference to two criminal cases pending, one in Lewis and Clark County, Cause No. 3963 and one in Cascade County, Cause No. 6537B. Supporting affidavit, exhibits and memorandum were filed.

Thereafter, on June 11, 1975, Objections to the Report, Findings and Recommendations of the Commission were filed. ·Generally the objections dispute (a) the rules, (b) counsel, (c) the Commission, (d) procedures, (e) the charges. Also included was a request that the transcript of the proceedings had before the Commission be made a part of the record.

Subsequently, the jury in Lewis and Clark County Cause No. 3963 has rendered a verdict of guilty. Judgment was entered and sentence pronounced on July 14, 1975.

This Court in effect, granted in part the Motion for Continuance referred to above by deferring action until after judgment in Lewis and Clark County Cause No. 3963.

The Court has studied the transcript as requested by L. R. Bretz.

The Court, being fully advised now orders that the objections of respondent L. R. Bretz are denied, the Motion for Continuance to a time beyond the trial in Cascade County Cause No. 6537B is denied.

Now therefore, by authority vested in this Court by law and the Rules of the Commission on Practice of this Court,

It is hereby ordered and adjudged that L. R. Bretz be, and he hereby is, found guilty of the charges in the attached report of the Commission on Practice, and that he be disbarred and that his name be stricken from the roll of attorneys and counselors of this Court and that he be precluded from practicing as such attorney and counselor in all the ·courts of this State.

The Clerk of this Court shall give notice in this manner:

(Title of Court and Cause)

This is to inform all concerned that L. R. Bretz has been by this Court found guilty of the charges set forth in the report of the Commission on Practice filed in the office of the Clerk; that he has been disbarred and his name stricken from the roll of attorneys and counselors of this Court and

26

he is precluded from practicing as an attorney and counselor in all the courts of this State.

Dated this 14 day of July, 1975.

Thomas J. Kearney<br>Clerk of the Supreme Court.

(SEAL)

Such notice shall be published in the forthcoming issue of the Bar Bulletin of the State Bar of Montana; copy of this: Order shall be forwarded to L. R. Bretz, his counsel, the Chair- man and Secretary of the Commission on Practice, the Clerk of the Federal District Court for the District of Montana, and the Clerk of the United States Court of Appeals, Ninth Cir- cuit. Copies of the aforementioned notice from the Clerk shall be mailed by the Clerk of the Supreme Court to the Clerks of the district courts of the State of Montana.

REPORT, FINDINGS OF FACT,<br>AND RECOMMENDATIONS<br>PRELIMINARY DISCUSSION

Under its rules of *January 1, 1965,* Creating and Governing the Commission on Practice of the Supreme Court of Montana, this Court imposed upon this Commission the duty to receive and investigate complaints of alleged misconduct on the part of any lawyer in the State of Montana (*Rule III*), and gave to this Commission the option of either referring the com- plaint to a Grievance Committee or "* * * as otherwise directed by the Commission on practice * * * " (Rule IV (b)). Formal complaints seeking disciplinary action against an attorney shall be prepared (or authorized) by the Com- mission on Practice and signed by any interested person (Rule V (a)); and those filed in the Supreme Court shall be con- ducted in the name of the State of Montana, and shall be prosecuted by the Attorney General "with the aid and assist- ance of one or more members of the Bar of Montana" (*Rule: IX*).

The Legislature of the State of Montana directed the Attorney General to conduct an investigation of the Workmen's Compensation Division of the State of Montana for any improprieties in the operation of that department.

In the latter part of *1973,* a complaint against Luke McKeon was received by the Commission. Fearing prejudice with respect to any criminal prosecution, the Attorney General requested Mr. Patrick F. Hooks, Esq., Secretary of this Commission, to have the Commission refrain from taking immediate action. Shortly thereafter a complaint against L. R. Bretz was received from Eugene Hall, Sr., the substance of which is incorporated in Count Four of the current complaint. In deference to the request from the Attorney General, the Commission delayed action on both complaints. Subsequently McKeon was prosecuted, pled guilty to felony counts, and was disbarred by this Court.

On January 30, 1974, the Attorney General acting in the name of, and by authority of, the State of Montana, filed a joint information in the State District Court in Cascade County, Montana, against Respondent L. R. Bretz and one Gloria Eusek Carden alleging some 28 different felony counts charging larceny, forgery, and theft involving Workmen's Compensation claimants who were clients of Respondent Bretz. There was extensive newspaper notoriety throughout Montana which has periodically continued to date. The record will disclose that those 28 counts were subsequently dismissed in the Cascade County District Court and later filed and incorporated in an information containing 58 counts. During the months of *July* and *August, 1974,* this Commission discussed the charges, the potential seriousness thereof, their impact on the public, particularly in view of Watergate, and the extensive newspaper publicity in Montana concerning the charges. The Commission agreed to the advisability of securing special counsel, independent of the office of the Attorney General, to investigate the incidents and report back to the Commission on Prac-

tice so that the Commission could determine whether or not the matters justified immediate official, formal action and consideration by this Commission. To that end the Commission solicited and secured the services of William Bellingham, Esq., with assistance from Earl L. Hanson, Esq., and Neil E. Ugrin, Esq., all practicing lawyers who have no official connection with the office of the Attorney General.

Under date *September 12, 1974,* the Commission received a formal letter from the Attorney General advising that as required by legislation he was conducting an investigation of the affairs of the Workmen's Compensation Division of the State of Montana, that he had developed factual information from his investigation of a course of conduct on the part of Respondent L. R. Bretz which appeared to violate the Code of Professional Responsibility for Attorneys.

On or about *October 23, 1974,* Special Counsel Bellingham and Patrick Hooks, Esq., Secretary of this Commission, met with Mr. Richard Dzivi, special assistant of the Attorney General; were shown by him copy of the criminal information which had been filed in Cascade County in *July, 1974;* and were shown copies of those papers filed by the Respondent Bretz in that County Court in support of a motion to strike the information. Except that one of the client accounts filed by Mr. Bretz in the Cascade County District Court in *July, 1974,* in support of the motion to strike ended in a "-$24" and which may have been one of the accountings submitted in evidence at the time of the hearing in this case, none of the remaining evidential material pertaining to the Six Counts filed in the complaint herein were discussed nor examined by Mr. Hooks, who left the meeting prior to the time that Mr. Bellingham departed. If there were written statements from any witnesses, in the files of the Attorney General, none of them were disclosed to either Mr. Bellingham or Mr. Hooks.

After the initial contact with Mr. Dzivi described above, Mr. Bellingham, or Mr. Hanson, or Mr. Ugrin interviewed wit-

nesses who later testified at the hearing in this case. After those interviews, Mr. Bellingham drafted a complaint which he felt should be considered by this Commission, copies of which were submitted to each Commission member. Since the law firm of which Commissioner John H. Weaver is a member negotiated a settlement with Respondent Bretz involved in one of the Counts, Mr. Weaver disqualified himself from any further participation. A meeting of the Commission was held in Missoula, Montana, on *November 2, 1974*. Mr. Bellingham met with the Commission at that time; expressed his view that on the basis of the interviews with the witnesses that had been carried out, and the allegations as set forth in the complaint, that a formal hearing was warranted at which the Respondent Bretz would be entitled to hear the evidence, present his defense, and the Commission would be in a position to weigh and judge that evidence. None of the oral or documentary evidence presented at the time of the hearing was presented to nor considered by the Commission at that meeting.

The Commission discussed the matter pro and con including the extensive newspaper reports of the *July* filings in Cascade County, and concluded that the matter was sufficiently serious to the Bar of the State of Montana, the public, and Respondent, that a complaint should be filed, and a formal hearing conducted. There was also some discussion with respect to whether or not there should be a temporary suspension of Respondent pending the outcome of the hearings, but it was unanimously agreed by the Commission that Respondent was entitled to the presumption of innocence of the charges until proved otherwise in accordance with due process procedures, that since the Commission had not received or considered the evidence, that the Commission was not warranted in making any prejudgment of the matter on the basis of the information which it had received, and that no suggestion should be presented to the Supreme Court one way

or the other with respect to the matter of temporary suspension or other procedures prior to a formal hearing.

Prior to the hearing, Mr. Bellingham withdrew as a Special Prosecutor and Frederick Moulton, Esq., substituted in his place. At all times the Special Counsel working on this matter in connection with the processing of the complaint in this case worked independently of the office of the Attorney General. Although they interviewed numerous witnesses, at no time did they ever take any written statement from any witness, and the substance of the evidence which they learned in those interviews was all presented at the hearing in this case. Likewise, except to procure the issuance of subpoenas, none of the Special Prosecutors ever consulted with nor discussed the case with any member of the Commission prior to nor during the hearing. Except for the initial meeting on or about *October 23, 1974,* described above, when Mr. Hooks and Mr. Bellingham met with Richard Dzivi, no member of this Commission prior to the hearing of this cause ever saw any of the documentary evidence produced at the hearing; nor heard nor discussed any of the oral evidence produced at the hearing, nor the substance thereof; nor had any oral or written contact with any witnesses; nor, except for the administrative act of issuing subpoenas when requested, had any contact with Special Counsel processing the complaint. No member of this Commission prior to the conclusion of the hearing and the subsequent study of the record after the record had been prepared either had or expressed any opinion with respect to the ultimate decision to be reached in this matter.

Neither the Attorney General nor any of his administrative assistants participated in the preparation of the complaint, nor the investigation nor procurement of any evidence in support of the complaint, nor the preparation nor presentation of any material at the hearing itself. All such matters were taken care of by the members of the Montana Bar Association selected to do so by this Commission. Neither the Attorney

General nor any of his administrative assistants participated in nor had any connection with the deliberations by the Commission, and the transcribed record has never been disclosed to anyone except this Commission, and Respondent.

The complaint in this matter was filed in this Court on *November 5, 1974,* and promptly served upon the Respondent. Under date *November 27, 1974,* Respondent answered the complaint and filed separately a "Motion for Continuance" on these grounds:

"Said Motion is submitted on the grounds and for the reasons that any further proceedings in this particular matter would be prejudicial and in violation of Mr. Bretz' constitutional rights as to the criminal matters presently pending. Additionally, Mr. Bretz and his attorney do not have sufficient time in which to attend hearings or meet the allegations against the Respondent at this time due to the fact of previous commitments as to the pending criminal matters."

No factual affidavits nor legal memoranda were submitted in support of this motion, and it was denied by the Commission.

Under date *December 18, 1974,* Respondent filed a "Motion to Quash or Strike" including as grounds that the complaint was not filed in accordance with the rules of the Commission on Practice of the Supreme Court; that the complaint reflects a prejudgment by the Commission on Practice which would have to be overcome by the Respondent before the evidence could be weighed thoroughly and impartially by the members of the Commission which appeared to Respondent to be the parties complaining, triers of fact, prosecutors, and judge. There were other matters requesting the striking of allegations from the complaint. A brief without citation of any legal authority was submitted in support of this motion, and the motion after due consideration was denied.

Served on Respondent by mail on *February 13, 1975,* was an

32

order setting this matter for hearing at Great Falls, Montana at 1:30 p.m. on *February 27, 1975.*

It should be noted that between the date of *July 30, 1974,* when the Attorney General filed the joint information in the State District Court in Cascade County, Montana, until the complaint was filed in this matter on *November 5, 1974* before this Commission, Respondent had the opportunity in those criminal proceedings through available discovery procedure of securing any and all evidence that the law permitted pertaining to the charges. Likewise, between the date the Complaint now under consideration by this Commission was filed in this Court on *November 5, 1974,* and the date of the hearing on *February 27, 1975,* Respondent had the privilege through the normal discovery procedures of procuring any and all non-privileged evidence pertaining to the complaint in the hands of either the members of the Commission, or in the hands of the Special Counsel processing the complaint, or from the clients of Respondent Bretz named in the six counts set forth in the complaint. At no time prior to the commencement of the hearing were there any procedures taken by Respondent for production or discovery of any evidence. Furthermore, it is manifest from the record that Respondent actually had already in his file long prior to the filing of the complaint on *November 5, 1974,* all of the documentary evidence that was actually produced at the hearing.

After the hearing had commenced, Respondent repeated the grounds of motion outlined above which had previously been denied by the Commission. Respondent also requested a continuance until the Special Prosecutor produced, for examination, all statements taken from any and all witnesses. Respondent cited to the Commission in support of his motion two decisions of the Supreme Court of the United States— *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103. The motion was taken under advisement.

The Commission ascertained that no written statements had ever been procured from any witness by Special Counsel prosecuting the complaint. Furthermore, respondent had in his own files copies of all documentary evidence in the official files of Montana's Workmen's Compensation Division submitted by Special Prosecuting Counsel, along with considerable additional documentary evidence procurable only from Respondent's own files.

During the progress of the hearing, the Commission read the two decisions of the Supreme Court of the United States cited and relied upon by Counsel for Respondent. After Special Counsel had submitted all evidence in support of the complaint, after the Commission had the benefit of reading the decisions relied upon by Respondent, and after Respondent had commenced and was well along in presenting his evidence in defense, the Commission denied all motions by Respondent.

As reflected above, Commissioner John H. Weaver disqualified himself before the complaint was filed. There is no evidence of any bias or prejudice or pre-judgment by Commissioner Patrick F. Hooks. Nevertheless, in order to insure that Respondent has been afforded all protections contemplated under the requirements of due process, Commissioner Hooks disqualified himself before the transcript of the record was completed. Neither Commissioner Weaver nor Commissioner Hooks have participated with the remaining members of the Commission in weighing and evaluating the evidence in the record, nor in the formulation of the Findings of Fact and Recommendations by the Commission to the Court.

Count Six of the complaint was dismissed on motion of the Special Prosecutor.

This cause came on regularly to be heard at Great Falls, Montana on the *27th day of February, 1975,* before a Hearing Committee composed of Commission members W. T. Boone, Chairman and Hearing Officer, Patrick F. Hooks, Milton G. Anderson, Thomas M. Ask, Carl M. Davis, Cale J. Crowley,

and Baxter Larson. Attorneys Fred Moulton, Earl J. Hanson, and Neil E. Ugrin were present as Special Prosecutors; the Respondent attorney was personally present and represented by his attorney, Mr. Charles F. Moses. Thereupon oral and documentary evidence was introduced and the hearing was concluded on *March 1st, 1975*. Following the conclusion of the hearing a transcript of the testimony was obtained which, together with the Exhibits introduced, have now been reviewed by the members of the Hearing Committee, and from their consideration of the same, the Hearing Committee now makes and adopts the following:

## FINDINGS OF FACT

1. *GENERAL.* The Respondent, L. R. Bretz, has been a practicing attorney with offices in Great Falls, Montana since *October 1, 1953*, during which period he has been associated, at times, with others (*Tr. 611-613*). In the second year of his practice, he commenced handling industrial accident claims and tort claims. (*Tr. 615*) At that point in time the IAB claims represented fifty percent of his business and over the years increased to eighty per cent (*Tr. 615-616*). He has always represented claimants and plaintiffs; never defendants or insurance companies (*Tr. 616*). His probate practice has been negligible; he does not handle collections; his divorce practice is limited (*Tr. 616-617*).

2. *COUNT ONE—DONALD V. BARRY.* Donald V. Barry sustained an injury to his foot and ankle on *April 28, 1964*, in an industrial accident. Bretz undertook to represent him on *May 4, 1964,* (*Tr. 78 and 620*). Barry received checks for weekly compensation on *May 21, June 3* and *June 11, 1964,* all endorsed and cashed by him in Great Falls. (*Exhibits CC, DD, EE*), (*Tr. 565*).

Barry left Montana about *June, 1964* to seek employment in Anchorage, Alaska (*Tr. 19*). Mrs. Barry and their two children followed in *January, 1965,* (*Tr. 80*). He was never disabled due to that injury for any extended period of time.

*(Tr. 90)*. On *June 9, 1964,* Mrs. Barry, at her husband's request, wrote the IAB advising he was no longer unemployed *(SC Ex. 1 (4))* and *(Tr. 114-115)*. From that date, *June 9, 1964,* Barry was never disabled or unable to work because of that injury. *(Tr. 116-117)*.

At the time Bretz first undertook to represent Barry on the compensation claim, *May 4, 1964, (Tr. 620)*, he was already representing Barry on other business matters including the formation of a corporation, Continental Steel Structures, which he incorporated *December 1, 1964, (Tr. 624-625)*. Bretz was "bankrolling" Barry in his part of that expense *(Tr. 623, 632)*. Subsequently Bretz did additional work connected with business operations of that corporation *(Tr. 629-632)*. Bretz loaned the corporation $2,000.00 and advanced cash to Barry on *November 23, 1964,* for which Bretz testified he has a receipt *(Tr. 652-653 and 712)*. The loan and advances to the corporation are not relevant in this cause. *(Tr. 712)*.

A meeting was held in Great Falls in December, 1964, with parties interested in investing in the corporation. Barry did not attend because he was in Alaska *(Tr. 654)*.

*Exhibit YY* is a form of appointment of Bretz as attorney-in-fact executed and mailed from Alaska by Barry and dated *November 20, 1964, (Tr. 698-699)*. No such form was found in the official IAB file *(SC Ex. 1)*, although Bretz testified that he had delivered the original to the IAB Chairman Carden at the time of the settlement *(Tr. 700)*; he further testified that the IAB would not permit an attorney to commit a client to a settlement without such written authority. *(Tr. 700)*. The printed rules of procedure of the IAB then in effect (1969) revision) make no reference to a power of attorney procedure; *Rule 20* provides:

"Attorneys. Upon employment, the attorney representing a claimant before the Board shall obtain from the claimant, and file with the Board, a written appointment, signed by the claimant, designating him to act in his behalf."

Bretz wrote Barry a letter on *April 2, 1965, (Ex. HH)* and again on *May 8, 1965.* (*Ex. II*). This last letter concerned a possible settlement of Barry's claim. Barry replied to the *May 8* letter on *May 18, 1965, (Ex. C and Tr. 656-657)*. This was the last letter from Barry. Subsequent to Barry's letter of May 18, Bretz wrote Barry on *May 26, 1965, (Ex. JJ), October 20, 1965, (Ex. KK), January 7, 1966, (Ex. LL), February 10, 1966 (Ex. MM), May 2, 1966, (Ex. NN), August 15, 1967, (Ex. OO), October 16, 1967 (Ex. PP), September 4, 1970, (Ex. QQ), October 1, 1970, (Ex. RR)* with which Bretz said he enclosed a check for $480.00 to defray Barry's expenses to Montana (*Tr. 675*), and the last letter on *November 5, 1970, (Ex. SS)*. The last contact Bretz had with Barry was a telephone call from him prior to the *October 1, 1970* letter (*Ex. RR, Tr. 708*). *Exhibit OO* shows that a third person had advised Bretz that Barry "had recently had some heart trouble."

Barry died in Anchorage, Alaska, on *January 2, 1971* from a heart attack. (*Ex. A.*) Bretz first learned of Barry's death from the Great Falls Credit Bureau during the course of the Legislative Audit investigation. He wrote to Alaska and confirmed that Barry was dead and got back a death certificate (*Ex. A*) (*Tr. 696-697*), certified under date of July 29, 1974.

Not having heard from Barry in response to the letters referred to previously, Bretz procured a medical report from Dr. Kelly of Bozeman, dated *July 18, 1972, (Ex. E and Ex. TT)* with respect to Barry's physical condition which was sent to the IAB to support settlement of Barry's claim (*SC Ex. 1*). Dr. Kelly's report does not show whether he in fact examined Barry (*Tr. 709*), but it is clear from *Exhibit D* that Kelly had not in fact examined him (*Tr. 714*).

Under date of November 15, 1972, Bretz prepared and filed with IAB a "Petition Requesting a Lump Sum Settlement" in which it is stated, in part:

## "IV.

That some eight years has elapsed . . . and your claimant still experiences discomfort . . . and that on account of said discomfort, considerable employment opportunities have been lost, and your claimant would estimate that more than one year and one-half time has been lost from normal occupation of steel structural worker on account of said injury . . ." (*SC Ex. 1(3)*). This petition was executed by Bretz as attorney for claimant. The IAB recognized this petition despite *Rule No. 19(a)* which requires "the settlement must be made on the written petition signed by the claimant." Bretz explained the above quoted statements in the petition that those statements were the same way an attorney "would draw up a complaint and make a number of allegations". (*Tr. 757*). In *SC Ex. 1* is a notation by Carden dated *December 18, 1972* which states that Carden had been contacted by Bretz, that Carden offered $2,400.00 in settlement and Bretz indicated ". . . he would discuss this with the client and return a petition, if acceptable."

On *December 20, 1972* there was filed a petition for a compromise settlement with a signature purportedly of "Donald V. Barry" but was in fact signed by Bretz. (*Tr. 760*). The petition was witnessed by Bretz, (*SC Ex. 1*). Under date of *December 23, 1972,* an Order Approving a Full and Final Compromise Settlement, with an award of $2,400.00 was signed by J. J. Carden, Administrator (*SC Ex. 1*). Under date of *December 22, 1972* a letter was written from the Board to Bretz enclosing an Order approving the settlement and an official draft. for $2,400.00 payable to Donald V. Barry (*SC Ex. 8*). The name of Barry was endorsed on the draft on *January 2, 1973* by Bretz, as attorney-in-fact. No original of any authorization for Bretz to endorse a check as attorney-in-fact for Barry was in the official Workmen's Compensation file (*SC Ex. 1*). The proceeds were placed in Bretz' office bank account known as the 517 Strain Bldg. Account (*Tr. 713, 759-761*). Bretz

testified that office operational costs were paid for out of that account.

Barry's widow knew nothing of any settlement until *August 1974* when she was contacted by investigators from the Attorney General's Office *(Tr. 113)*. She had never seen the draft, *(Tr. 110)*, nor had she received any proceeds *(Tr. 114)*.

There was no evidence presented that Bretz, after receiving the $2,400.00, made any further effort to contact Barry until after the commencement of the Legislative Audit investigation.

The proceeds of the Barry check *(SC Ex. 8)* did not remain in the 517 Strain Bldg. account, but passed through that account in the course of business and disbursement. *(Tr. 774)*. Bretz' position was "that the money was mine and that I had a perfect right to deposit it and spend it", *(Tr. 774)* and there was "no obligation to hold any part of the $2,400.00 in trust or for the account of Mr. Barry", *(Tr. 774)*, and that Barry did not have anything coming ". . . living or dead". *(Tr. 775)*.

*Exhibit FF,* called an "activity sheet" is a summary made up by Bretz for the purpose of reflecting his activities, time, expenses and charges, in connection with the corporate matters as well as his handling of the IAB claim. This was prepared according to Bretz' best recollection in early 1973 or in the middle of 1973. The summary was made from slips of paper in the Barry file which related to phone calls, trips, or someone coming into the office. Bretz did not keep a daily time record. These miscellaneous slips were retained for the purpose of billing and he used the slips, correspondence and documents in the file to refresh his recollection and from which he would then determine how much time was spent. *(Tr. 640-642)*. The Exhibit was prepared nearly eight years after the representation commenced. *(Tr. 638)*. The "activity sheet" represents a composite statement both for representation of the corporation as well as the IAB handling. It does contain two errors. First, the total in charges add up to

$2,485.40 instead of $2,385.40, and secondly, the receipt from Barry for $332.40 advanced is listed as a charge in that amount. Since the advancement is not shown in the "activity sheet" the $332.40 should be eliminated as a charge, with the result that the "total file charges and expenses" should be in the amount of $2,153.00. Additionally the "activity sheet" reflects a $15.00 charge for conference time on the industrial accident claim which is improper since Bretz was handling this matter on a contingent basis. All charges and expenses incident to corporate matters are not properly chargeable against the proceeds of the Barry industrial accident settlement.

Bretz did not notify the Industrial Accident Board of Barry's death and did not feel that he had any duty to do so because of the criminal charges pending against him. Otherwise he acknowledges that such a duty would be present. (*Tr. 879-860*). Bretz did not return the settlement proceeds to IAB, as in his opinion, Barry's heirs would be entitled to anything that Barry had coming had he lived; likewise Bretz made no effort to contact Barry's heirs with respect to the IAB matter because of the pending criminal charges against him. (*Tr. 880-881*).

3. *COUNT TWO—GAYLORD R. GILBERT.* Gaylord R. Gilbert, a construction worker and farmer of Vaughn, Montana, consulted Bretz on *March 17, 1967,* at Bretz' office, (*Tr. 124 & 790*), about a malpractice claim against Dr. James E. Elliott of Havre, Montana and/or Kennedy Deaconess Hospital of that city due to the amputation of the distal end of one finger of his right hand (*Tr. 126, 784, 791*) which Gilbert claimed resulted from tight bandaging causing gangrene (*Tr. 126*); and two industrial accident claims, one against Baltrusch Construction Company from an accident on *January 16, 1966,* (*Tr. 129*) resulting in a hernia and a second against Schultz and Lindsay from an accident on *August 12, 1968* (*Tr. 784*) causing a back injury (*Tr. 129*). As to fees to be paid Bretz,

there was no written agreement; there is no dispute as to the fees for the IAB claims where Bretz was to receive fifty percent of that recovered (*Tr. 131 and 839*); on the malpractice claim the claimant represents that the agreement called for Bretz to receive twenty or twenty-five percent of any recovery (*Tr. 131*), while Bretz claims that he refused to take the case on a contingency basis and as a result ultimately charged claimant on a time basis, using the State Bar Association minimum fee schedule (*Tr. 792*). Both on the IAB claims and the malpractice cases, Bretz charged expenses in addition to fees (*Ex. ZZ*)

Bretz commenced an action for damages on behalf of Gilbert against the hospital on *January 26, 1968* (*Tr. 794*). The purpose of this suit was discovery—to get the records to determine whether there was a suit against the doctor (*Tr. 154 & 835*). That suit was dismissed with Bretz' consent on *July 1, 1968* and no recovery was accomplished. (*Tr. 794*). That action was followed by a suit for damages against Dr. Elliott, based on the same incident as was involved in the hospital case. This suit was filed on *June 20, 1969* (*Tr. 795*). Gilbert authorized Bretz to file this action on May 5, 1969 (*Ex. ZZ, Count 2*). The defendant was served on *November 11, 1969* and failed to appear within the time allowed by law which resulted in Bretz making application for the entry of his default which was accomplished on *December 29, 1969* (*Tr. 796*). There was no activity on this case during the year 1970 and on *January 19, 1971*, after a hearing attended by claimant, the trial court entered a judgment in favor of claimant for $6,480.00 (*Tr. 796-797*). On *May 5, 1971* the defendant moved to set aside the default and in preparation for a hearing thereon Bretz associated Attorney LaRue Smith to do research on the matter (*Tr. 799*). The District Court set the default judgment aside (*Tr. 799*) and the next question which arose was whether the claimant was entitled to sanctions for the defendant's delay. (*Tr. 800*). The court entered an order for sanctions in

the amount of $1,002.39. (*Tr. 800*—). The claimant was unhappy with the decision and Bretz explained to him that his remedy would be an appeal to the Supreme Court (*Tr. 800*). A notice of appeal was filed on *June 30, 1971* and an effort was made to pursue this in forma pauperis with Bretz preparing a financial statement and an affidavit to support that position. (*Tr. 800*). The appeal was not pursued for economic reasons, and after discussion with the claimant, a settlement of this action was arrived at for $1,500.00, (*Tr. 801*). This settlement was authorized and agreed to by the claimant; a release was executed by the claimant (*Ex. ZZ—Count 2 Ex. 8*), and claimant additionally executed an authorization for Bretz to negotiate draft of Aetna Life and Casualty Company issued in the settlement amount (*Exhibit F*).

The "pauper" affidavit, filed *June 27, 1971,* in part recites that Gilbert was "an impoverished person, being a family man with wife and children and who is able to earn only enough to support said family for the necessities of life as a construction worker." (*Tr. 861-862*). As was the case in Count One— Donald V. Barry, Bretz prepared an "activity sheet", *Exhibit ZZ*, a portion of which (*Count 2, Exhibit 1 thereof*) is a summary of time and charges relating to the action against the Kennedy Deaconess Hospital; another portion thereof (*Count 2, Exhibit 10*) covers time and charges relative to the civil action against Dr. Elliott. These Exhibits were prepared sometime subsequent to *November, 1971.* (*Tr. 868*) (with the handwritten portion added 3 or 4 months prior to the hearing) (*Tr. 874*). They reflect time and expense charges on the hospital case of $1,825.15, even though no recovery was made; and $2,759.84 on the suit against the doctor, with a recovery of $1,500.00. Accordingly the total fees and expenses charged to Gilbert on the malpractice situation was $4,584.99 with a total recovery of $1,500.00, or stated otherwise, with a net deficiency of $3,084.99. The settlement draft for $1,500.00 dated *August 27, 1971* (*Exhibit ZZ, Count 2 Exhibit 8*) was

cashed by Bretz and Gilbert received no part thereof. (*Tr. 142, Ex. ZZ, Count 2, Ex. 10*). Bretz did not submit a bill or an accounting to Gilbert when the hospital case was dismissed. He claims that he told Gilbert during the pendency of the Elliott case that Gilbert owed him $1,825.15 for the hospital suit. (*Tr. 868*). The Commission does not accept this claim because the computation of time and charges on the hospital case was not prepared until sometime subsequent to *November, 1971*, (*Tr. 868*) at which time the charges of $1,825.15 were determined. Bretz did not furnish a statement or an accounting to Gilbert at the time of the settlement of the Dr. Elliott malpractice case of the time and charges involved (*Tr. 869*), and here again the computation of the time and charges incident to that file were prepared subsequent to *November, 1971*. (*Tr. 868*).

With respect to the two IAB claims, Gilbert executed an appointment of Bretz as his attorney on *January 25, 1971*, to represent him before the Board. A separate appointment was made for each claim (*SC Ex. 2*) and (*SC Ex. 3*). Additionally Gilbert executed on the same date an appointment of Bretz as his attorney-in-fact on both claims. (*Tr. 806, Ex. E.*)

Prior to Bretz' representation of Gilbert on the two IAB claims, Gilbert had received weekly compensation payments on the Baltrusch claim totaling in amount $459.00 (*SC Ex. 2*); no temporary disability weekly payments were received on the Schultz and Lindsay accident. Bretz testified that on the Baltrusch claim additional medical evidence was needed; that he sent Gilbert to Dr. Sims in Helena, Montana, and secured a medical report from him which was made a part of the IAB file (*Tr. 813, 814*). On the Schultz and Lindsay claim Bretz sent Gilbert to Dr. Kelly at Bozeman for an examination and report which was filed with the IAB on *August 25, 1971*. (*SC Ex. 3*). The memorandum notes and inter-office communications in these files show that these two claims were

discussed together with Chairman J. J. Carden on *November 19, 1971* with an agreement being reached to settle both claims for a total of $7,650.00, with $1,650.00 assigned to the Baltrusch accident and $6,000.00 to the Schultz and Lindsay claim (*SC Ex. 2 and 3*). A petition for a lump sum settlement in the amount of $7,650.00, covering both claims, is found in *Exhibit SC 3*, was signed by Gilbert, witnessed by Bretz, and concurred in by Carden, all dated *November 8, 1971*. This petition is a printed form and the blank spaces were filled in in handwriting by someone other than Gilbert. In the Baltrusch file (*SC Ex. 3*) is an Order Approving a Full and Final Compromise Settlement for $6,000.00 under date of *November 22, 1971*; in the Schultz and Lindsay file (*SC Ex. 2*) is an Order Approving Full and Final Compromise Settlement in the amount of $1,650.00 bearing the same date. The Baltrusch file (*SC Ex. 2*) contains a letter of transmittal dated *November 22, 1971* to Bretz, enclosing the check for $1,650.00. The Schultz and Lindsay file does not contain any such letter but does reflect a check being issued on the final settlement under date of *November 23, 1971* in the amount of $6,000.00. These two checks are *Exhibits Nos. 9 and 10*. Both checks were payable to Gaylord R. Gilbert and were mailed to Bretz. The $1,650.00 check was sent to Gilbert with an accompanying letter (*SC Ex. 15*)—referred to as a "Speed Letter" dated *November 26, 1971,* stating:

"Enclosed find Industrial Accident draft in settlement of claim. You and I had a 50-50 deal on this claim and then I owe you some money on the suit against Dr. Elliott. This draft should cover both of these deals, but the charges for Dr. Kelly's examinations are:

| | |
|---|---:|
| Montana Physical Therapy | $15.00 |
| Intercity Radiological | $30.00 |
| Francis Kelly | $40.00" |

The check was endorsed "Gaylord R. Gilbert" "Lola L. Gil-

bert". Gilbert testified that he endorsed that check and received the proceeds. (*Tr. 141, 142*).

The $6,000.00 check bears an endorsement "Gaylord R. Gilbert", (*Exhibit 9*). Bretz admits that he signed Gilbert's name to the check (*Tr. 824*). The check was handled by someone from Bretz' office; Bretz individually did not have an account in that Bank, (*Tr. 827-828*); the check was deposited to the account of Intermountain Trading & Security Company (*Tr. 867*). This was a Bretz corporation, a collection company, but it is no longer doing business nor in good standing. (*Tr. 769-770*). The proceeds from the check were retained by Bretz against attorney fees and costs (*Tr. 822*). Gilbert did not receive any part of the proceeds (*Tr. 151*).

Gilbert's first knowledge of the $6,000.00 settlement was when he was contacted by the Attorney General's investigation in the *Fall of 1974*. (*Tr. 147-146*). His only contact with Bretz, substquent to *November 26, 1971* (when he received the $1,650.00 check) related to Bretz' letter of *August 19, 1974* to Credit Bureau of Havre (*SC Ex. 16*) concerning an unpaid bill from the Elliott suit (*Tr. 148-151*). No accounting was rendered by Bretz to Gilbert (*Tr. 191-193*). Without knowledge of the $6,000.00 settlement Gilbert agreed that Bretz should receive the $1,500.00 malpractice settlement check, with Gilbert to get the $1,650.00 compensation check (*Tr. 142*).

The activity sheet (*Exhibit ZZ*), represents an accounting by Bretz of all time, fees and charges relative to these malpractice and IAB claims. In summary that Exhibit reflects a total recovery of $9,150.00, of which the client received $1,650.00, and the balance, $7,500.00 went to the attorney for fees and costs; it further shows that the client, despite that distribution still owes the attorney $1,448.24 which was "written off" by the attorney (*Tr. 841*); or stated differently, the total time and charges were just $211.76 less than the amount of the total recoveries, without consideration being given to

the medical bills paid by Gilbert shown in *Exhibit 15,* which total $85.00.

4. *COUNT THREE—EARL GUSZREGAN.* Earl Guszregan, a resident of Sunburst, Montana, by letter (*Ex. SC 4, No. 2*) requested Bretz to represent him in connection with an industrial accident which occurred on *December 20, 1968.* The letter was received by Bretz on *May 10, 1971 (Tr. 935).* The letter was written by Merrill Cline and signed by the claimant (*Tr. 385*). Cline contacted Guszregan at Sunburst, showed him a paper which contained a list of names, including Guszregan's who, according to Cline, had claims as injured workmen that were still "open", (*Tr. 384*); the time was running out on his claim (*Tr. 383*); and suggested he knew a lawyer who would take care of the matter (*Tr. 385*). The lawyer was Bretz whom Guszregan did not know—in fact he had never seen him prior to the hearing of this matter. (*Tr. 385*). For 18 years Cline had been and still is a client of Bretz. At that time Cline was working for Union Bankers Life Insurance Company out of Billings. At the time of the hearing he was unemployed. In 1968 he was an inmate in San Quentin Penitentiary. (*Tr. 959-960*).

This industrial accident claim arose when the claimant, while working for Toole County as a snowplow operator, hit a snowdrift, tearing the tailbar off of the blade. When he tried to pick it up (weighed about 800 lbs.), he injured his back. (*Tr. 386*). He lost two days work. (*Tr. 458*).

The legal problems confronting Bretz on this claim were:

(1) It was barred by Section 92-601;

(2) It was barred for failure to give notice within 60 days; and

(3) There was little or no evidence of injury or loss of time.

(*Tr. 936*). These, and Bretz' efforts to counteract the same, were brought to Guszregan's attention by various documents and telephone calls (*Tr. 939*), and *Exhibits N, O, P, Q, R, S, T and U*). Medical evidence was obtained from Dr. Kelly of

Bozeman, Montana, and his report, *Exhibit AA,* was filed with the IAB *(Ex. SC 4)*. Trips were made to Helena and Bozeman to obtain the file, to discuss the medical situation with Dr. Kelly and for settlement discussions with Board representatives. *(Tr. 938)*. On October 18, 1972, Bretz sent claimant *(Ex. U)* for execution an appointment of attorney-in-fact, *(Exhibit V)* which claimant executed, had acknowledged and returned. Bretz expressed the hope of a settlement before Christmas. *(Exhibit U)*. Guszregan was not advised as to the amount of the hoped for settlement. *(Tr. 390)*.

On *October 31, 1972,* Bretz filed a petition for compromise settlement with the IAB, signed "Earl Guszregan" and witnessed by Bretz. *(Ex. SC No. 4-No. 1)*. This was not signed by Guszregan, *(Tr. 406-407.)* The petition sought $3,000.00 and was approved by Carden, and an order approving full and final compromise settlement in the amount of $3,000.00 was signed by J. J. Carden, Administrator, on *November 1, 1972 (Ex. SC No. 4)*. A letter bearing the same date to Bretz *(Ex. SC No. 4)* transmitted a check to Earl Guszregan in the amount of $3,000.00 *(Ex. No. 11)*. The check was endorsed by Bretz signing Guszregan's name, at the Great Falls National Bank, cash obtained and brought back to Bretz' office. *(Tr. 945-946)*. Bretz testified that about $1,800.00 ($3,000.00 less one-third attorney fee, plus $200.00 expense) *(Tr. 984)* was put in an envelope, which was put in the office safe, earmarked for Guszregan *(Tr. 980)*, and later deposited to the "New Western Exploration and Development Company, Inc." account in the Central Bank of Montana *(Tr. 980-981) (SC Ex. 24-No. 1)*. The claimant had no knowledge of the settlement or the amount thereof until he received a letter from the Legislative Auditor's Office asking if he was satisfied with the settlement. He replied "what damn settlement . . . . ." ". . . . . I never seen none." *(Tr. 390, 391, 392)*. The Legislative Audit commenced in *September, 1973 (Tr. 977)*. In *January, 1974,* Attorney Dzivi from the Attorney General's Office contacted

the claimant with a copy of the IAB check (*Ex. 11*) and wanted to know if he received it, and he replied that was the first time he had ever seen the check. (*Tr. 391*). At all times, for nine years, Guszregan had lived at the same address and had the same phone number. (*Tr. 393*).

Then Guszregan received a check from Bretz, drawn on the New Western Exploration and Development Company account, dated *December 27, 1973*, payable to him in the amount of $1,721.60, (*Ex. 1 of SC 24, No. 1*) together with an accounting (*Ex. SC 24, No. 2*). He was dissatisfied with the accounting because he had paid Dr. Kelly's bill of $95.00, the bill of Bozeman Deaconess Hospital for $10.00, and Inter-city Radiology, $18.00. (*Tr. 402* and *446.*), and objects to the $140.00 charged for travel, the $15.00 telephone call, in view of the $1,000.00 attorney fee. (*Tr. 446-447*) ; otherwise the fee charged was satisfactory. (*Tr. 444*).

Bretz' explanation for the late accounting (13 months after the settlement check was received) was that he expected his client, after the February letter, (*Tr. 971*) to come to his office; additionally his bookkeeper terminated (*Tr. 973*); his explanation for the corporate check was that the 517 Strain Building account was being used for income tax preparation (*Tr. 976*). Bretz claims that he too had paid the two bills to Dr. Kelly, but could only submit documentary proof of a $45.00 payment (*Ex. Z and Ex. DDD*) (*Tr. 950 to 955*).

Ironically when Guszregan came to prepare his income tax return, after the receipt of the New Western Exploration and Development Company check, it being a corporation check, caused him to conclude that he had to include it in his income tax return as ordinary income, which he did, and paid a tax thereon; he felt that since it was a corporate check, that it would be considered as income. (*Tr. 445*).

5. *COUNT FOUR—EUGENE NEVILLE HALL, SR.*

Hall, a married man with six children (two living at home), a resident of Great Falls, Montana, sustained a back injury

on *September 18, 1965, (Tr. 996)* while working for Bob and Ole's Conoco. *(Tr. 199-200) (and Exhibit SC No. 5)*. A customer who identified himself as a private detective working part time for Bretz, recommended that claimant contact Bretz, *(Tr. 201)*, which he did, *(Tr. 203)*, on *February 11, 1966 (Tr. 995)*. He told Bretz about the service station accident and also that he had been previously injured (back injury) in Iowa. *(Tr. 204, 995)*. Bretz said he would write a letter on the Iowa matter and "if we don't get anything there . . . . . . or any settlement of any kind . . . then let's pursue the Montana claim." *(Tr. 204)*. By *Exhibit K* Hall authorized the investigation. *Exhibit EEE* is the documentary file showing the effort, and the failure to re-open the Iowa Industrial Accident claim because of the running of a statute of limitations. Bretz made a trip to Iowa to investigate the claim and to secure local counsel *(Tr. 1001)*; the application to re-open was set for hearing, which the claimant advised Bretz he was too busy to attend. *(Tr. 1000)*. Hall did authorize the association of Iowa counsel *(Ex. K)* and the expenditure of $50.00 to hire counsel *(Tr. 206)*. Bretz later advised Hall that the Iowa claim was no good *(Tr. 207.)*

There was no fee arrangement made with Hall on the Iowa claim because, in Iowa fees are fixed by the Commission and Bretz believes that he so advised Hall *(Tr. 1028)*. No fees were fixed by the Iowa Commission *(Tr. 1029)* and Bretz determined he should be paid on this claim at the time of recovery on the Montana IAB claim *(Tr. 1029)*.

When Hall first consulted Bretz, he signed two or three documents in blank *(Tr. 204-205)*, one of which was the appointment of Bretz as his attorney-in-fact relative to the Montana IAB claim, *(Ex. SC 18, Ex. GGG)*; this was later dated *November 3, 1970;* also a designation of Bretz as his attorney, dated *February 11, 1966 (Ex. SC 5)*.

The problem confronting Bretz on this claim is amply ex-

pressed in the inter-office communication of the IAB file, and dated *October 27, 1970,* by J. J. Carden, Chairman:

"This claim has been in dispute for some time in view of the position of the employer that the injury did not arise out of his employment. Bretz then presented a statement from the employer indicating that he did recall the incident and felt that it was an aggravation of a pre-existing condition. After some discussion it was agreed that if the employer would submit a Form 37, Employer's First Report of Injury, which is the obligation of Bretz to obtain, then we would settle the matter for $2,500.00 which includes all liabilities over this controverted occurrence." (*Ex. SC 5*)

Bretz obtained the Form 37 on *October 29, 1970* and filed the same with the IAB on *November 4, 1970.* (*Ex. SC 5*). Additionally *Exhibit M* reflects that Bretz caused extensive investigation work to be undertaken; bills rendered and paid by him for such services totaled $265.80 in addition to medical bills of $131.50. On *November 6, 1970* a form Petition for Compromise Settlement in the amount of $2,000.00 was filed with the IAB; this bore Hall's signature and Bretz' signature as a witness. (*Ex. SC 5-No. 1*). Hall signed this petition in blank (*Tr. 239-240*) and had no knowledge of any petition for any particular amount of money (*Tr. 240-241*) and never knew of any $2,000.00 settlement until the Special Investigators came to his house (*Tr. 241*), just before Thanksgiving of 1973 (*Tr. 227*). On *November 16, 1970,* an Order Approving Compromise Settlement of the claim for $2,000.00 was signed by J. J. Carden and Jack C. Carver, Commissioner, (*Ex. SC 5*) and on the same day a letter was sent to Bretz sending a copy of the Order and a check payable to Hall in the amount of $2,000.00 (*Ex. SC 5*). The check is *Exhibit SC 12.* Bretz endorsed Hall's name to the check (*Tr. 1037*); it was either cashed or deposited to the 517 Strain Building account by one of this secretaries (*Tr. 1038*); no part thereof was put in cash in an earmarked envelope in the safe "because the money was disbursed too

50

quickly." (*Tr. 1038*). He did not see or talk with Hall after the date of the check, *November 16, 1970*. (*Tr. 1039*). The next time the Hall matter was raised was when he got a letter dated December 24, 1973 from Attorney Huss (*Tr. 1040*) (*Ex. No. 17*); Bretz had not previously furnished Hall with an accounting (*Tr. 1043*).

Bretz did call Hall and advise that he had a tentative offer of settlement but would not say for how much (*Tr. 217*). At a later time Hall received a call from Bretz's secretary advising that the settlement had come in; when asked as to how much, she stated she didn't know and that it was up to Mr. Bretz to tell him (*Tr. 219*); when asked how much he, Hall, would receive, she replied that she would have to talk to Mr. Bretz who was in Helena and would call him back (*Tr. 220*). Later that same day she did call Hall back, telling him that she had called Bretz in Helena, and Bretz had authorized $500.00, and that she would put a check for $500.00 in the mail, which Hall received the next day. (*Tr. 220-221*). It was drawn on the office account (*Tr. 221*) and no accounting accompanied it. (*Tr. 222*). Hall tried several times afterwards to see Bretz to get an accounting, but he was unavailable and did not call as the secretary promised. (*Tr. 223*). He also wrote Bretz a letter asking for an accounting, but received no reply (*Tr. 225*). He then contacted Attorney Huss to get an accounting from Bretz (*Tr. 229*). He was furnished with an accounting after Huss obtained the same from Bretz (*Tr. 231*) (*Ex. 17 & 18*).

The accounting rendered by Bretz was in his letter of *December 26, 1973* to Attorney Huss (*Ex. 17*). It shows a total recovery of $2,000.00; attorney fee of $350.00, and expenses of $86.70 on the Iowa claim for a total of fees and costs on Iowa of $436.70; attorney fee on the Montana IAB case of $666.00, investigative expense $265.80, and medical expenses paid $131.50, or a total of fees and expenses on the Montana IAB case of $1,062.30. Or, analyzed differently, the total fees

charged Hall were $1,016.00, total expenses $484.00, and a net recovery to the client of $500.00 (*Exhibit 17*).

On *November 23, 1973* Hall wrote a letter to the Industrial Accident Board (*Ex. SC 5*) complaining about the settlement He asserted therein that the signature on the check was "a forgery"; also that "my attorney told me that the settlement was only $1,000.00 and consequently I was only paid by the attorney's secretary $500.00."

## 6. COUNT FIVE—ROBERT DALE MORRIS.

Robert Dale Morris, now a resident of Billings, was living in Dupuyer in 1965 where he was employed by Al Johnson on the Swift Dam (*Tr. 470-471-472*); on *November 4, 1965* while so employed, he had an industrial accident in which he sustained an eye injury which necessitated medical attention and hospitalization (*Tr. 472*). This accident and claim is the subject of *Exhibit SC No. 6* which reflects that Morris was paid $126.00 in weekly compensation payments and medical expenses of $303.36 were paid by the Board.

Morris contacted Bretz for representation on this claim (*Tr. 474*) in March, 1966, at Bretz' office (*Tr. 884*). On the occasion of Morris' first meeting with Bretz, Bretz inquired whether Morris had had any prior injury, and Morris informed him that he had been injured in a Wyoming industrial accident (*Tr. 517-518*), but there was nothing to be done because the statute of limitations had passed (*Tr. 518*). Morris further testified that he did not request Bretz to do any work on this matter (*Tr. 519*); Bretz testified to the contrary (*Tr. 884*). However, Morris did in fact sign a letter on *March 14, 1966,* (*Ex. AA*) to the Clerk of Court, Newcastle, Wyoming, expressing his desire to re-open the 1960 Wyoming claim and designating Bretz as his attorney. Bretz made one trip to Newcastle, Wyoming to talk with the County Attorney and to arrange a medical examination. This trip was totally unproductive (*Tr. 889*). To pursue the matter would require Morris getting financially involved, which he was unwilling to do,.

52

and the claim was dropped (*Tr. 890*). *Exhibit AAA* reflects the limited correspondence between Bretz and the Wyoming officials in this matter. At a later date, following the conclusion of the Montana IAB claims, Bretz charged Morris for mileage and road expenses involved in the Wyoming trip totaling $179.00 (*Tr. 890*) (*Ex. SC No. 27*).

As mentioned previously, the Montana IAB claim for which Bretz was engaged, arose out of an accident on *November 4, 1965*. Before any disposition was made of that claim, Morris sustained a second industrial accident injury—this on *September 12, 1969*, while working for Neilson-Smith (*Tr. 473*) (*Ex. SC 7*). The 1965 accident involved an injury to the right eye (*Tr. 485*) (*SC Ex. 6*); the 1969 accident involved an injury to the left eye (*Ex. SC 7*). When Morris engaged Bretz on the 1965 accident, Morris signed four forms in blank at Bretz' request (*Tr. 479*). The IAB file on the 1965 accident (*Ex. SC 6*) contains a designation by Morris of Bretz as his attorney. It does not contain a power of attorney from Morris to Bretz. Morris, without assistance from Bretz, made a claim for compensation out of the 1969 injury, (*Ex. SC 7—No. 1*); this IAB file does not contain any designation of Bretz as Morris' attorney, nor does it contain a power of attorney to Bretz from Morris. Morris did not contact Bretz concerning the 1969 accident, nor have any attorney for it, and other than making a claim for compensation and receiving some weekly benefits, he did not pursue that claim any further (*Tr. 486*).

On the other hand, Bretz testified that it was his understanding that he was to handle both claims (*Tr. 895*). He produced *Exhibit No. 29* which was a form appointment of attorney-in-fact, signed by Morris, which has the blank spaces filled in in typewriting and relate to the *October, 1965* accident. This was one of the forms which Morris signed in blank. At a later date, Bretz, in his handwriting, included the date of the second accident "12th of September, 1969" and the name of the employer in the second accident "Nilson Smith".

Bretz also produced *Exhibit BBB* which is a designation by Morris of Bretz as his attorney for the September, 1969 accident. An examination of this Exhibit, and particularly a comparison of the signature purported to be Morris' thereto with other signatures of Morris in *Exhibits SC 6* and *SC 7*, raises a serious question whether Morris in fact did sign that designation.

Bretz concluded that the two Montana IAB claims had very little value and he settled both of them for $500.00 *(Tr. 896)*. In connection therewith a form petition for compromise settlement, dated *March 3, 1972*, and filed *March 10, 1972*, signed by Morris and witnessed by Bretz, petitioned the Board for a compromise settlement of $500.00 on the 1965 accident *(Ex. SC 6—No. 1)*. This was a form signed in blank by Morris. This petition was sent to the Board with a letter from Bretz which contained this statement:

"You indicated you would settle both of this man's claims for this sum but I only have the number for the one case and so you are authorized to insert the number of the other case on this particular application form so that both of the files can be closed."

*(Ex. SC 6)*. Pursuant thereto the petition which contained in typing "Claim No. 55-1972", the claim number for the 1965 accident, was amended in handwriting with the insertion of an additional "claim No. 51-2662", the claim number for the 1969 accident. On *March 13, 1972*, an Order was made approving a full and compromise settlement of both claims for $500.00 *(Ex. SC 6—No. 4)*. On the same date a letter was written to Bretz transmitting a copy of the Order and a check in the amount of $500.00 *(Ex SC 6—No. 3)*. The check was payable to Robert D. Morris and is *Exhibit No. 13*.

The endorsement signature "Robert D. Morris' was not signed by Morris, nor by Bretz, but by someone in Bretz office. *(Tr. 924)*. The check was taken by a Bretz employee to the First National Bank of Great Falls, negotiated, and the proceeds

went into the 517 Strain Building account (*Tr. 925*) and ultimately came out of the 517 Strain Building account by cash or by check. The signing of Morris' name and the negotiation of the check were under Bretz' specific instructions (*Tr. 926, 927*).

Morris had no contact with Bretz after the 1969 accident—no letters, no calls, no office visits (*Tr. 501*). This first knowledge of any payment having been made on the two IAB claims was when he was called by investigators from Helena in *July* or *August 1974* (*Tr. 502*). He has had no contact with Bretz since that time and has not received any accounting from Bretz on the $500.00 payment.

Bretz considered that the two IAB claims had only a nuisance value and were settled on that basis (*Tr. 896*). He testified that before making the settlement he made an effort to locate Morris to get his approval; he sent a man to Lewistown to try to find him, but couldn't locate Morris. Because of his inability to locate Morris, he went ahead and made the settlements. (*Tr. 896-897*). Bretz further testified that Morris did not contact him to give him any change in address or telephone number (*Tr. 897*).

Bretz prepared an accounting in connection with the criminal charges (*Ex. SC 27*). As previously pointed out, Bretz charged mileage, meals and road expense on the Wyoming claim of $179.00; mileage for trips to Helena and Lewistown of $107.00, paid medical expenses $50.00 and long distance telephone calls and photocopies $22.00. All of these expenses total $358.00 which, when added to an attorney fee of one-third of recovery, $166.67, resulted in total costs and attorney fees of $524.67 or $24.67 in excess of the recovery. Thus by Bretz' accounting, with Morris receiving nothing, Morris is indebted to him in the amount of $24.67. Morris, under date of August 22, 1974, was interviewed by Investigator Lindsey from the office of the attorney representing Bretz and *Exhibit SC 26* reflects the questions propounded.

## 7. *GENERAL*.

The cumulative evidence discloses a general practice by Respondent of having each and every client execute broad general powers of attorney, in addition to designation of Respondent as their attorney, usually in blank. With one exception,. the signatures of the clients on the powers of attorney involved in this proceeding were notarized while the client was absent and was not present before the Notary. The Respondent offered no evidence that he or anyone acting on his behalf had given any explanation to any of these clients of the nature or extent of the power which they had vested in him under such instruments, nor of the manner in which he exercised those powers. Three of the clients testified that they were simply advised that the papers they were signing in blank authorized the Respondent to procure records from the Workmen's Compensation Division, but that they were never advised and did not comprehend or understand that they were giving Respondent the authority to determine the amount for which a compromise settlement should be sought, or the amount for which a compromise settlement would be accomplished; and likewise to sign their names to checks thereby negotiating them.

The cumulative evidence further establishes that with the power of attorney procedure used, the clients involved were not consulted in advance of negotiations for and the petitioning of compromise settlements, nor the amount of final settlements negotiated, were unaware of what was taking place with respect to their claims, and were not informed as to what the attorney had done under the powers conferred.

The cumulative evidence further establishes that in no instance was there any agreement or accounting with or between attorney and client as to the disbursement of the client's funds before the actual disbursement was made; and no accounting was in fact made by the attorney to the client after this disbursement.

The cumulative evidence suggests that the accountings which the Respondent produced at the time of hearing were drawn up and prompted by his knowledge that the Legislative Auditor was investigating 300 of his Workmen's Compensation claimant clients.

The cumulative evidence further discloses that in all cases where the Respondent attorney cashed and negotiated settlement checks, the proceeds from the same were not put into or processed through a trust account, but were in all cases commingled with Respondent's personal funds.

The cumulative evidence further shows that the total amount recovered by the Respondent attorney in checks made payable to his clients in the five counts totaled $17,050.00, of which the clients received $3,871.60, and the balance went to the Respondent for claimed fees, time charges and costs.

From the foregoing Finds, the Hearing Committee makes the following:

## CONCLUSIONS

1. An attorney is bound to conduct himself in all negotiations and dealings with his client as a fiduciary occupying a position of the highest trust and confidence. Any transaction with the client must be characterized by the utmost honesty and good faith. The "arm's length rule" applicable in ordinary business transactions is totally inapplicable in business dealings between the attorney and his client. When the evidence reflects, as it does in this case, that an attorney has seemingly profited at the expense of his clients, it is incumbent upon the attorney to show by clear and satisfactory evidence, not only that there was no undue influence or unfairness, but that his client had all the information and advice reasonably necessary to comprehend and understand the details of their business arrangement (see for example the principles spelled out in *Daniels v. Paddock*, 1965, 145 Mont. 207, 399 P.2d 740).

There was no written contract or agreement between re-

spondent and any client spelling out the arrangement for fees, costs, disbursements or accounting. Respondent admits that in order for the relationship of attorney and client to be recognized and accepted by Montana's Workmen's Compensation Division, all that is required is a written "designation of attorney" executed by the client. Respondent went further; he secured from each client a written "power of attorney" extremely broad in its general terms. Three of the clients involved testified they were handed several printed forms, in blank, to execute; that they were not executed by them before any Notary Public; that they understood that they were simply authorizing the Respondent to secure documentary records from the Workmen's Compensation Division and to represent them before the Board. They testified that they were never advised by Respondent, nor by anyone acting on his behalf, that they had given to Respondent the power to endorse their names on drafts, nor to disburse the proceeds derived therefrom in any manner which Respondent saw fit. In the other two claims the evidence simply reflects that Respondent sent printed forms to the clients which they returned in the mail. The record is devoid of any evidence on behalf of Respondent of any explanation to any client of the nature or extent of the power of attorney he had extracted from the client, nor of the purposes for which he intended to use that authority in the exercise of that power, nor of the manner in which he intended to conduct business transactions thereunder, nor that respondent ever advised any client after the business details had been transacted of what he had done in using those powers. The evidence reflects that Respondent used those powers of attorney to present false evidence and false claims to the Workmen's Compensation division in the name of his client; that he had received drafts from the State of Montana made payable to the clients in settlement of claims; that with the exception of one draft which he endorsed as "attorney-in-fact", he endorsed, or caused to be endorsed, a

58

false signature purportedly that of the client, and that thereafter Respondent disbursed all funds to suit his own purposes. At all time, acting under the pseudo authority of these powers, with the exception of the one draft he endorsed as "attorney-in-fact", he concealed the truth from the maker of the drafts, from the Banks through which they were negotiated, and from his clients. He also concealed from every client the fact of the settlement amount and the details of disbursement.

Recognizing that in appropriate circumstances where upon candor and fairness are extended to and between all parties affected, legitimate power of attorney is a useful tool in the practice of law and the conduct of business in general, the manner in which Respondent procured and used the powers of attorney in all these claims, not only violates and abuses the Canons of Ethics promulgated by the Court, but is tainted with moral turpitude and shocks the conscience of fair minded attorneys and laymen alike.

2. The Respondent attorney in his policy and practice of obtaining a broad general power of attorney from clients on Workmen's Compensation claims and proceeding under them failed his duty as a fiduciary or trustee occupying the highest position of trust and confidence to inform his clients of relevant considerations and factors in the decision making process and of his rights and interests in the subject matter; and failed to give his clients the opportunity to make decisions which within the concepts of the attorney-client relationship exclusively were within the authority of the client and not of the lawyer to make. By reason thereof the Respondent attorney has failed in his duties to his clients and has made meaningless the attorney-client relationship, and in its place the Respondent assumed the dual role of both client and attorney. This practice transcends the duties and responsibilities of an attorney to his client.

3. The Respondent attorney had the duty to render to his clients a full, detailed and accurate account of all monies

received by him for his clients. This duty includes the duty to notify a client promptly upon his receipt of monies for the benefit of his client. This duty likewise assumes a clear understanding and agreement between them as to the compensation the attorney is to receive and is entitled to retain from settlement proceeds. The Respondent attorney failed to perform the duty to account in that he did not notify his clients of settlements made, or of the receipt of settlement proceeds, or render to them promptly, or at all, until the onset of the Legislative Auditor's investigation, or this hearing, a proper account. By reason thereof the clients involved were unaware of settlements made, and the receipt of monies, and were deprived of their right to participate in the determination of the distribution of the funds as between the attorney and themselves.

We further conclude that the Respondent attorney has charged against settlement funds received by him on Workmen's Compensation claims, without prior authorization from his clients, debts claimed owning to him for services and expenses on matters unrelated to the particular compensation claim involved, all contrary to *Section 92-801, R.C.M., 1947,* as amended.

4. The record is replete with uncontradicted and undisputed evidence that Respondent, or his legal secretaries acting on his behalf and at his direction, took the settlement drafts made payable to his clients, negotiated those drafts in local Banks in Great Falls, and either took the cash or deposited the proceeds in Respondent's own personal bank accounts. Respondent not only mingled the funds with his own, but he thereafter disbursed and used those funds for his own private purposes, wholly concealing from each client what he had done.

As early as 1919 in the case of *In re Lunke,* 56 Mont. 226, 182 P. 126, the Court condemned such practice and suspended the attorney from the practice of law.

Effective September 28, 1965, the Court adopted the Canons of Professional Ethics of which Canon 11 provides:

"11. Dealing With Trust Property. The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

Since the promulgation of the foregoing Canon, the Court has likewise adopted for Montana practitioners the Canons of Ethics as published by the American Bar Association which include precisely the same prohibition with respect to mingling of funds and usage of funds as are set forth in Canon 11 quoted above.

There was no isolated violation by Respondent of this basic principle forbidding and precluding him from mingling the funds of his clients with his own and using them for his own private purposes, but rather an established general practice in all cases.

5. In connection with Count One-Donald V. Barry, and with the evidence disclosing that the Respondent attorney accomplished a compromise settlement on the basis of the petition referred to many months after his client had died, we conclude that the Respondent attorney, under those circumstances, and upon learning that his client had died, had the duty to return to the Industrial Accident Board the settlement proceeds and to take further steps on behalf of Barry's widow and children to have determined whether they were entitled to recover from the Industrial Accident Board compensation for permanent partial disability existing prior to his death. In making this conclusion we recognize that *Section 92-606 of the Revised Codes of Montana provides:*

"If the employee shall die from some cause other than the

injury" (such as occurred in the Barry case) "there shall be no recovery for compensation after his death";
and we recognize that the Supreme Court in *Breen v. IAB,* 150 Mont. 463-475, 436 P.2d 701, said that statute does not preclude the payment of compensation if a permanent disability had occurred prior to death.

 Montana likewise follows the common law rule that a power of attorney not accompanied by an interest terminates with the death of the donor. If we assumed in this case that the power of attorney did in fact legitimately authorize Respondent Bretz to endorse drafts payable to client Barry as an "attorney-in-fact", the death of Mr. Barry terminated that authority. When the Respondent ascertained in mid-1974, that his client Barry had died in January of 1971, and that he had wrongfully negotiated the draft payable to Barry in late 1972, Respondent had the additional duty at that time to take whatever steps were reasonably necessary to see that the proceeds of that draft were returned to proper sources for proper disbursement to whatever persons were legally entitled to receive them. Having wrongfully mingled those funds in his own private accounts, and having done so without any legal authority to do so, then it became incumbent upon Respondent to rectify those errors and to make restitution.

 6. Lastly, we conclude that the course of conduct pursued by the Respondent attorney, as set forth in the Findings and the foregoing Conclusions, established by clear and convincing evidence that the Respondent attorney is totally unfit to continue in the practice of law, and should be disbarred by this Court.

The foregoing Report, Findings of Fact, and Conclusions is adopted by the Hearing Committee and reported to the Commission on Practice of the Supreme Court of the State of Montana, this 23rd day of May, 1975.

62

HEARING COMMITTEE
By *W. T. BOONE,* Chairman
*CALE CROWLEY*
*THOMAS M. ASK*
*BAXTER LARSON*
*MILTON G. ANDERSON*
*CARL M. DAVIS*

The foregoing Report, Findings and Conclusions of the Hearing Committee have been considered by the Commission on Practice of the Supreme Court of the State of Montana, which adopts the same and makes the following recommendation to the Supreme Court of the State of Montana:

1. That the respondent attorney, L. R. Bretz, be found guilty of the charges filed against him in Counts One to Five, both inclusive, and that he be disbarred from the practice of law.

DATED, this 23rd day of May, 1975.

COMMISSION ON PRACTICE OF THE SUPREME COURT OF THE STATE OF MONTANA

By *W. T. BOONE,* Chairman
*CALE CROWLEY*
*THOMAS M. ASK*
*BAXTER LARSON*
*MILTON G. ANDERSON*
*CARL M. DAVIS*